MATT O'MALLEY (SBN 272802)
PATRICK MCDONOUGH (SBN 288285)
San Diego Coastkeeper
2825 Dewey Rd # 207
San Diego, CA 92106
Ph: (619) 758-7743
Email: matt@sdcoastkeeper.org

COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
Email: marco@coastlawgroup.com

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation, <br><br>        Plaintiffs, <br><br>   v. <br><br> DECCO CASTINGS, INC., a California corporation, <br><br>        Defendant. | Civil Case No. <u>'20 CV0523 BEN BLM</u> <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq*.)** |

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper (collectively "Plaintiffs"), by and through their counsel, hereby allege:

# I.    JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.     On October 23, 2018, Plaintiffs issued a 60-day notice letter ("Notice Letter") to Defendant Decco Castings, Inc. as owner and operator of the Decco Facility located at 1596 Pioneer Way, El Cajon, California 92020 ("Decco Facility" or "Facility"), regarding Defendant's violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*) ("Industrial General Permit"). True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit A and incorporated herein.

3.     Plaintiffs also sent the Notice Letter to the registered agents for Defendant, the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Board as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

4.     More than sixty (60) days have passed since the Notice Letter was served on Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is

diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

5.     Venue is proper in the Southern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

## II.     INTRODUCTION

6.     Plaintiffs seek relief for Defendant's substantive and procedural violations of the Industrial General Permit and the Clean Water Act resulting from Defendant's activities at the Decco Facility.

7.     Specifically, Defendant has discharged and/or continues to discharge polluted storm water from the Decco Facility to downstream waters and groundwater including Forester Creek, San Diego River, and the Pacific Ocean (collectively "Receiving Waters") in violation of the express terms and conditions of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1301, 1342.

8.     Defendant has also violated and continues to violate the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the Industrial General Permit.

9.     This complaint further seeks relief to prevent discharges in violation of the Industrial General Permit as amended by *Order No. 2014-0057-DWQ* ("2015 Permit"). These are ongoing and continuous violations of the Clean Water Act and the Industrial General Permit.

10.     With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial facilities like those conducted at the Decco Facility flow into storm drain systems, local tributaries, and the Receiving Waters.

11.     Among the Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, hundreds of bird, and numerous mammal species, as well as vital macro- and micro-invertebrate species which are an important link in the

food web between the producers (leaves, algae) and higher consumers such as fish.

12.   This discharge of polluted storm water and non-storm water from the Facility causes and/or contributes to the impairment of downstream Receiving Waters and compromises or destroys their Beneficial Uses.

13.   Storm water and non-storm water contaminated with sediment, heavy metals, pathogens, nutrients, and other pollutants harm the special biological significance of the Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

14.   The polluted discharges from the Decco Facility also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Coastkeeper's and CERF's members. The public's use, including Coastkeeper's and CERF's members, of the Receiving Waters for water contact recreation exposes people to toxic metals and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to these waters.

15.   Plaintiffs seek declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's repeated and ongoing violations of the Clean Water Act and the Industrial General Permit.

**III.   PARTIES**

**A.   Plaintiffs.**

16.   San Diego Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office at 2825 Dewey Road, Suite 207, San Diego, California 92106.

17.   San Diego Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper

Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation. Coastkeeper implements this mission through outreach and education programs that work to prevent water pollution, as well as community activism, participation in governmental hearings, and prosecuting litigation to ensure that San Diego's beaches, bays, coastal waters, and tributary streams and rivers meet all substantive water quality standards guaranteed by Federal, State, and local statutes and regulations. When necessary, Coastkeeper directly initiates enforcement actions on behalf of itself and its members.

18.     Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located at 1140 South Coast Highway 101, Encinitas, California 92024.

19.     CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to aggressively advocate, including through litigation, for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

20.     Plaintiffs have thousands of members who live and/or recreate in and around the Receiving Waters.  Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies and educational activities, among other activities.

21.     Defendant's failure to comply with the procedural and substantive requirements of the Industrial General Permit and the Clean Water Act results in discharges of polluted storm water to the Receiving Waters. Defendant's polluted discharges degrade water quality and harm aquatic life in the Receiving Waters, and thus impair Plaintiffs' members' use and enjoyment of those waters.

22.     The violations of the Industrial General Permit and Clean Water Act at the Decco Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have

been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Industrial General Permit and the Clean Water Act.

23. The relief sought herein will redress the harms to Plaintiffs' members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

**B. The Owner and/or Operator of the Decco Facility.**

24. Plaintiffs are informed and believe that Decco Casting, Inc. is an active California corporation and its registered agent is Colm Christopher Plunkett,1596 Pioneer Way, El Cajon, California 92020.

25. Plaintiffs are informed and believe that Decco Castings, Inc. is the Owner and/or Operator of the Facility. *See* Jan. 2019 Facility SWPPP.

## IV.   LEGAL BACKGROUND

**A.   The Clean Water Act.**

26. The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by a NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

27. Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated Sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

28. "Waters of the United States" are defined as "navigable waters" and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

29. The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see also*

40 C.F.R. § 122.2.

30.     The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce.

31.     The Clean Water Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water. *Rapanos v. United States*, 547 U.S. 715 (2006); *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

32.     A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999–00.

33.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000–01.

34.     Section 301(b) requires that, by March 31, 1989, all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)–(iii).

35.     Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. §§ 1365(a)(1), 1365(f).

36.     A corporate entity is a "person" within the meaning of Section 502(5) of the Clean Water Act. 33 U.S.C. § 1362(5).

37.     An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. 33 U.S.C. § 1365(a).

38.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day per violation for all violations occurring between January 28, 2009 and November 2, 2015, and $55,800 for violations occurring after November 2, 2015. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.

39.     Section 505(d) of the Clean Water Act permits prevailing, or substantially prevailing parties, to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees. 33 U.S.C. § 1365(d).

**B.     California's Industrial General Permit.**

40.     Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

41.     Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *Id.*

42.     California is a state authorized by the EPA to issue NPDES permits.

43.     In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

44.     The Industrial General Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA that regulates the discharge of pollutants from industrial sites. 33 U.S.C. § 1342.

45.     Between 1997 and June 30, 2015, the Industrial General Permit in effect was Order No. 97-03-DWQ ("1997 Permit").

46.     On July 1, 2015, pursuant to Order No. 2014-0057-DWQ ("2015 Permit"), the reissued Industrial General Permit took effect.

47.     The 2015 Permit supersedes the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit.

48.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Industrial General Permit and comply with its terms, or obtain and comply with an individual NPDES permit. 1997 Permit, Finding 2; 2015 Permit § I.A.12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the Industrial General Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. 1997 Permit, Finding 3; 2015 Permit § I.A.17.

49.     Violations of the Industrial General Permit are violations of the Clean Water Act. 1997 Permit § C.1; 2015 Permit § XXI.A.

**C.      The Industrial General Permit Discharge Prohibitions.**

50.     The Industrial General Permit contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit." 2015 Permit § III.A.

51.     The Discharge Prohibitions provisions prohibits the direct or indirect discharge of liquids or materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by a NPDES permit, to the waters of the United States. 1997 Permit § A.1; 2015 Permit § III.B.

52.     These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or

nuisance. 1997 Permit § A.2; 2015 Permit § III.C.

53.     The Industrial General Permit prohibits "[d]ischarges that violate any discharge prohibitions contained in applicable Regional Water Board Water Quality Control Plans (Basin Plans), or statewide water quality control plans and policies." 2015 Permit § III.D.

54.     The San Diego Basin Plan further establishes certain Waste Discharge Prohibitions. Basin Plan at 4-19.

55.     Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited. Allowances for dilution may be made at the discretion of the Regional Board." *Id*. at 4-20.

56.     Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the San Diego Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 Permit.

**D.     The Industrial General Permit Effluent Limitations.**

57.     The Industrial General Permit Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. 1997 Permit § B.3; 2015 Permit § V.A.

58.     Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include total suspended solids ("TSS"), oil and grease ("O&G"), and pH, among others.

59.     Pursuant to the CWA and the Industrial General Permit, dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 1997 Permit § B.3; 2015 Permit § V.A.

/ / /

60.     The EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks").

61.     The EPA Benchmarks provide a relevant and objective standard for evaluating whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); MSGP, 65 Fed. Reg. 64,746, 64,766−67 (Oct. 30, 2000); *see also* 2015 MSGP Fact Sheet at 50; EPA 2008 MSGP Fact Sheet at 106.

62.     Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Id.*

63.     The EPA Benchmark for TSS is 100 mg/L. 2015 MSGP Fact Sheet at 55−56.

64.     The EPA Benchmark for total zinc in freshwater is 0.12 mg/L. *Id.*

65.     The EPA Benchmark for total copper in freshwater is 0.014 mg/L. *Id.*

66.     The EPA Benchmark for oil and grease is 15 mg/L. *Id.*

67.     The EPA Benchmark for total iron in freshwater is 1.0 mg/L. *Id.*

68.     The EPA Benchmark for total aluminum is 0.75 mg/L. *Id.*

69.     The EPA Benchmark for pH is 6.0−9.0 s.u. *Id.*

70.     Failure to develop and/or implement BMPs that constitute BAT and BCT is a violation of the Industrial General Permit. 33 U.S.C. § 1311(b); 1997 Permit § B.3; 2015 Permit § V.A.

**E.      The Industrial General Permit Receiving Water Limitations.**

71.     The Industrial General Permit Receiving Water Limitation prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater from adversely impacting human health or the environment. 1997 Permit § C.1;

2015 Permit § VI.B.

72.    Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Industrial General Permit's Receiving Water Limitations. *Id.*

73.    The Industrial General Permit Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. 1997 Permit § C.2; 2015 Permit § VI.A.

74.    Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the Beneficial Uses of the waters that receive polluted discharges.

75.    The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan that contains WQSs for water bodies within its geographical area.

76.    WQSs applicable to dischargers covered by the Industrial General Permit include, but are not limited to, those set out in the Water Quality Control Plan for the San Diego Basin, California Regional Water Quality Control Board, San Diego Region ("Basin Plan"), and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

77.    The CTR includes numeric criteria set to protect human health and the environment in the State of California. *See* Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), *available at* http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

78.    The CTR sets forth maximum concentration levels of several toxic pollutants so that California can achieve health and environmental protection goals.

79.    The CTR sets forth the following maximum concentrations for freshwater inland surface water bodies: zinc – 0.12 mg/L; copper – 0.013 mg/L. 40 C.F.R. § 131.38.

80.     The Basin Plan identifies "Beneficial Uses" for water bodies in the San Diego region.

81.     Beneficial Uses for surface waters are designated under the Clean Water Act section 303 in accordance with regulations contained in 40 C.F.R. § 131. The State is required to specify appropriate water Beneficial Uses to be achieved and protected. Basin Plan, at 2-2.

82.     The Beneficial Use designation of surface waters of the state must take into consideration the use and value of water for public water supplies, protection and propagation of fish, shellfish and wildlife, recreation in and on the water, agricultural, industrial, and other purposes including navigation. *Id.*

83.     The Beneficial Uses of the San Diego River include: Contact Water Recreation; Non-Contact Water Recreation; Warm Freshwater Habitat; Wildlife Habitat; Preservation of Biological Habitats of Special Significance; Rare, Threatened, or Endangered Species; Agricultural Supply; and Industrial Service Supply. Basin Plan at Table 2-3.

84.     The Beneficial Uses of Forester Creek include: Contact Water Recreation; Non-Contact Water Recreation; Warm Freshwater Habitat; Wildlife Habitat; Industrial Service Supply; and Potential Municipal Supply. *Id.*

85.     The Beneficial Uses for the Pacific Ocean include: Industrial Service Supply; Navigation; Contact Water Recreation; Non-Contact Water Recreation; Commercial and Sport Fishing; Wildlife Habitat; Preservation of Biological Habitats of Special Significance; Marine Habitat; Migration of Aquatic Organism; Spawning Reproduction, and/or Early Development; Shell Harvesting; Aqua Culture; and Rare, Threatened, or Endangered Species. *Id.*

86.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

/ / /

87.     According to the 2016 303(d) List of Impaired Water Bodies, the lower reach of the San Diego River is impaired for benthic community effects, cadmium, indicator bacteria (enterococcus), nitrogen, low dissolved oxygen, phosphorus, total dissolved solids ("TDS"), and toxicity.

88.     According to the 2016 303(d) List of Impaired Water Bodies, Forester Creek is impaired for benthic community effects, indicator bacteria (including E. Coli, fecal coliform, and total coliform), nitrogen, phosphorus, selenium, and TDS.

89.     According to the 2016 303(d) List of Impaired Water Bodies, the Pacific Ocean shoreline at the San Diego River outlet is impaired for indicator bacteria, such as enterococcus and total coliform.

90.     Polluted discharges from industrial facilities, such as the Decco Facility, contribute to the degradation of these already-impaired surface waters, as well as aquatic-dependent wildlife.

91.     Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

92.     In adopting the CTR, the EPA expressly directed that "[a]ll waters (including lakes, estuaries and marine waters) … are subject to the Criteria promulgated today. Such criteria will need to be attained at the end of the discharge pipe, unless the State authorizes a mixing zone."  65 F.R. § 31682-01, 31701.

93.     Similarly, the Basin Plan provides that absent any "allowance for dilution," waste discharges are prohibited unless "the quality of the discharge" meets its Criteria. Basin Plan at 4-19.

94.     Because the Industrial General Permit Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable WQS, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the Industrial General Permit. *See* 1997 Permit § C.2; 2015 Permit § VI.A; *see also Santa Monica Baykeeper v. Kramer Metals,*

*Inc.*, 619 F. Supp. 2d 914, 926 (C.D. Cal. 2009).

95.    "'Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for [an] enforcement action.'" *Natural Resources Defense Council, Inc.* ("*NRDC*") *v. County of Los Angeles*, 725 F.3d 1194, 1204 (9th Cir. 2013) (quoting 40 C.F.R. § 122.41(a)).

96.    The Industrial General Permit Receiving Water Limitations are violated each time polluted storm water discharges from the Facility. Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS, it is a separate and distinct violation of Receiving Water Limitation C.2 of the 1997 Permit, Receiving Water Limitation VI.A of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

97.    Each time discharges of storm water from the Facility adversely impact human health or the environment, it is a separate and distinct violation of Receiving Water Limitation C.1 of the 1997 Permit, Receiving Water Limitation VI.B of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

**F.    The Industrial General Permit Storm Water Pollution Prevention Plan Requirements.**

98.    Section A.1.a and Provision E.2 of the 1997 Permit require dischargers to have developed and implemented a Storm Water Pollution Prevention Plan ("SWPPP") by October 1, 1992, or prior to beginning industrial activities, that meets all the requirements of the Industrial Permit. Sections X.A–B of the 2015 Permit require development and implementation of site-specific SWPPPs by July 1, 2015, or upon commencement of industrial activity.

99.    The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 1997 Permit § A.2; 2015 Permit § X.

100.   The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. 1997 Permit § A.2; 2015 Permit § X.G.

101.   The SWPPP must identify site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. 1997 Permit § A.2; 2015 Permit § X.H.

102.   The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT, and as necessary to comply with the Industrial General Permit. 1997 Permit § A.2; 2015 Permit §§ I.D.32, X.C.

103.   The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan, also referred to as a Monitoring and Reporting Plan. 1997 Permit §§ A.1–10; 2015 Permit §§ X.A–I.

104.   The Industrial General Permit requires the discharger to evaluate the SWPPP at least annually and revise it as necessary to ensure compliance with the Industrial General Permit. 1997 Permit §§ A.9–10; 2015 Permit §§ X.A.9, X.B.1. The 2015 Permit requires dischargers to "certify and submit via SMARTS their SWPPP within 30 days whenever the SWPPP contains significant revision(s)." 2015 Permit § X.B.2.

105.   The Industrial General Permit requires dischargers to conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit §§ A.9.a–c; 2015 Permit § XV.

106.   Section A.9.d of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Industrial General Permit. 1997 Permit §§ A.9.d.i–vi. If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the Industrial General Permit. *Id.* § A.9.d. The evaluation report shall be submitted as part of the Annual Report specified in § B.14 of the Industrial General Permit. *Id.*

107.   The SWPPP and site maps must be assessed and revised as necessary to ensure accuracy and effectiveness. 1997 Permit §§ A.1, B.3–4; 2015 Permit §§ I.J.55, X.B.1.

## G.     The Industrial General Permit Monitoring and Reporting Requirements.

108.   The Industrial General Permit requires permittees to develop and implement a monitoring and reporting program ("M&RP"). 1997 Permit §§ B.1–2, E.3; 2015 Permit, §§ X.I, XI.1.

/ / /

---

[1] The 2015 Permit refers to the M&RP as a Monitoring Implementation Plan or "MIP."

109.    The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Industrial General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit §§ B.2.a–b; 2015 Permit §§ X.I, XI.

110.    The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 1997 Permit §§ B.2.a, B.2.d; 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43.

111.    The M&RP must ensure that storm water discharges are in compliance with the Industrial General Permit Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit § B.2; 2015 Permit §§ I.J.55–56, XI.

112.    The M&RP shall be revised as necessary to ensure compliance with the Industrial General Permit. 1997 Permit § B.2.d; 2015 Permit § XI.A.4.

113.    The Industrial General Permit requires dischargers conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm water discharges. 1997 Permit §B.4.a (monthly observations of each discharge location required); 2015 Permit § XI.A.1 (monthly observations of each drainage area required).

114.    Section B.4.c of the 1997 Permit and Section XI.A.2 of the 2015 Permit require dischargers to document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges, and to eliminate unauthorized non-storm water discharges. 1997 Permit § B.4.c; 2015 Permit § XI.A.3.

/ / /

115.   The Industrial General Permit requires dischargers to revise the M&RP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 1997 Permit § B.4.c; 2015 Permit § X.B.1.

116.   The Industrial General Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. 1997 Permit §§ B.5, B.7; 2015 Permit § XI.B.4.

117.   The 1997 Permit defines Wet Season as October 1 through May 30. 1997 Permit, Section B.4.a.

118.   Section B.5.a of the 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. *Id.* Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled. *Id.*

119.   Section B.5.b of the 1997 Permit required sampling to occur during scheduled facility operating hours that were preceded by at least three (3) working days without storm water discharge.

120.   Section B.15 of the 1997 Permit required dischargers participating in a group monitoring plan to collect at least two (2) samples from each discharge point at the Facility over a five (5) year period. *See* 1997 Permit §§ B.5, B.7, B.15.

121.   Section XI.B.1 of the 2015 Permit requires sampling from a qualifying storm event ("QSE"), which is a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area.

122.   The 2015 Permit defines Reporting Year as July 1 through June 30. 2015 Permit § I.M.62.b.

/ / /

123.   Section XI.B.2 of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30).

124.   Section XI.B.11 of the 2015 Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via California's Storm Water Multiple Application & Report Tracking System ("SMARTS") database within thirty (30) days of obtaining the results for each sampling event.

125.   Section B.5.c.i of the 1997 Permit required dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and total organic carbon ("TOC"). A discharger may substitute analysis for O&G instead of TOC.

126.   Section B.5.c.ii of the 1997 Permit further required dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility.

127.   Section XI.B.6.a–b of the 2015 Permit requires dischargers to analyze samples for TSS, O&G, and pH.

128.   Section XI.B.6.c of the 2015 Permit requires dischargers to analyze samples for other pollutants likely to be present in significant quantities in the storm water discharged from the facility that serve as indicators of the presence of all industrial pollutants on a facility-specific basis.

129.   Section XI.B.6 of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved Total Maximum Daily Loads.

130.   Section B.14 of the 1997 Permit required that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include (1) a summary of visual observations and sampling results, (2) an evaluation of the visual observations and sampling and analysis results, (3) laboratory reports, (4) the annual comprehensive site compliance evaluation report specified in Section A(9), (5) an

explanation of why a facility did not implement any activities required, and (6) the records specified in Section B.13.i. *Id.*

131.    Section C.11.d of the 1997 Permit required facility operators to report any incidence of noncompliance with the Industrial Permit at the time monitoring reports are submitted. Reports of noncompliance must contain (1) a description of noncompliance and its cause, (2) the period of noncompliance, including exact dates and times, and if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (3) steps taken or planned to reduce and prevent recurrence of the noncompliance. 1997 Permit § C.11.d.

132.    Section XVI of the 2015 requires dischargers to submit an annual report to the applicable Regional Board by July 15 of each year. The Annual report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, (2) an explanation for any non-compliance of requirements within the Reporting Year, as indicated in the Compliance Checklist, (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation. *Id.*

133.    The Industrial General Permit requires that all reports, certifications, or other information required by the Permit or requested by a regional board to have been signed by an authorized representative of the facility's operators. 1997 Permit § C.9; 2015 Permit § XX.K.

134.    The Industrial General Permit requires that signatories under Sections C.9–10 of the 1997 Permit, and Sections XX.K–L of the 2015 Permit, to make the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to ensure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is to the best of my knowledge and

1
2
belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

3
**H.    The 2015 Permit Exceedance Response Actions Requirements.**

4
135.    The 2015 Permit includes Numeric Action Levels ("NALs") that are based
5
6
7
on EPA Benchmarks. Like Benchmarks, the NALs indicate "the overall pollutant control performance at any given facility." 2015 Permit § I.M.61; see also *id.* § I.M.62 and Table 2.

8
136.    When the 2015 Permit became effective on July 1, 2015, all permittees were
9
10
11
in "Baseline status." 2015 Permit § XII.B. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. *Id.* § XII.C.

12
13
14
15
16
17
18
19
20
137.    Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred. *See id.* § XII.C. By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of Industrial General Permit ("Level 1 Evaluation"). *Id.* §§ XII.C.1.a–c.

21
22
138.    Although the Level 1 Evaluation may focus on the drainage area(s) where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *Id.* § XII.C.1.c.

23
24
25
26
27
28
139.    Based upon the Level 1 Evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the Level 1 Evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the summary of the Level 1 ERA Evaluation, and a detailed description of the necessary SWPPP revisions, and any

1   additional BMPs for each parameter that exceeded an NAL. *Id.* §§ XII.C.2.a.i–ii.

2   140.   The permittee in Level 1 status must also certify and submit via SMARTS

3   the QISP's identification number, name, and contact information (telephone number,

4   e-mail address) no later than January 1 following commencement of Level 1 status. *Id.*

5   § XII.C.2.a.iii.

6   141.   A permittee's Level 1 status for a parameter will return to Baseline status

7   once a Level 1 ERA Report has been completed, all identified additional BMPs have

8   been implemented, and results from four (4) consecutive QSEs that were sampled

9   subsequent to BMP implementation indicate no additional NAL exceedances for that

10  parameter. *Id.* § XII.C.2.b.

11  142.   A discharger's Level 1 status for any given parameter changes to Level 2

12  status if sampling results indicate a NAL exceedance for that same parameter while the

13  discharger is in Level 1. Level 2 status commences on July 1 following the Reporting

14  Year during which the NAL exceedance(s) occurred. *Id.* § XII.D.

15  143.   Dischargers with Level 2 status shall certify and submit via SMARTS a

16  Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL

17  exceedance by January 1 following the Reporting Year during which the NAL

18  exceedance(s) occurred. For each new Level 2 NAL exceedance, the Level 2 Action Plan

19  must identify which of the demonstrations in subsection D.2.a through c the Discharger

20  has selected to perform. A new Level 2 NAL exceedance is any Level 2 NAL exceedance

21  for 1) a new parameter in any drainage area, or 2) the same parameter that is being

22  addressed in an existing Level 2 ERA Action Plan in a different drainage area. *Id.*

23  § XII.D.1.a.

24  144.   The Discharger shall certify and submit via SMARTS the QISP's

25  identification number, name, and contact information (telephone number, e-mail address)

26  if this information has changed since previous certifications. *Id.* § XII.D.1.b.

27  145.   The Level 2 ERA Action Plan shall at a minimum address the drainage areas

28  with corresponding Level 2 NAL exceedances. *Id.* § XII.D.1.c.

146.    All elements of the Level 2 ERA Action Plan shall be implemented as soon as practicable and completed no later than 1 year after submitting the Level 2 ERA Action Plan. *Id.* § XII.D.1.d.

147.    The Level 2 ERA Action Plan shall include a schedule and a detailed description of the tasks required to complete the discharger's selected demonstration(s) as described in subsections D.2.a through c of the 2015 Permit. *Id.* § XII.D.1.e.

148.    On January 1 of the Reporting Year following the submittal of the Level 2 ERA Action Plan, a discharger with Level 2 status shall certify and submit a Level 2 ERA Technical Report prepared by a QISP that includes one or more of the following demonstrations: (a) Industrial Activity BMPs Demonstration, (b) Non-Industrial Pollutant Source Demonstration, or (c) Natural Background Pollutant Source Demonstration. *Id.* §§ XII.D.2.a–c.

149.    NAL exceedances as defined in the Industrial General Permit are not, in and of themselves, violations of the Industrial General Permit. However, NAL exceedances indicate that a facility is performing poorly and failing to implement BMPs that achieve BAT and BCT.

150.    A "[d]ischarger that does not fully comply with the Level 1 status and/or Level 2 status ERA requirements, when required by the terms of this General Permit, is in violation of this General Permit." *Id.* § I.M.63.

## IV.    FACTUAL BACKGROUND

### A.    Facility Site Information, Industrial Activities, and Pollutant Sources.

151.    The Decco Facility first obtained Industrial General Permit coverage to conduct industrial operations at the Facility on September 3, 1998.

152.    The Facility submitted its most recent Notice of Intent ("NOI") to the State Board to obtain Industrial General Permit coverage for the Facility on April 3, 2015 ("2015 NOI"), under Waste Discharge Identification ("WDID") Number 9 37I014542, and identifies both the Facility site name and Facility operator as "Decco Casting."

153.   The 2015 NOI states the Decco Facility is approximately 30,000 square feet. The NOI further identifies 10,000 of these square feet as exposed to storm water and does not claim what percent of the site is impervious. *Id.* However, the 2019 Decco SWPPP states that 99% of the site is impervious.

154.   Plaintiffs are informed, believe, and thereon allege that the Decco Facility is currently an active industrial facility covered under the Industrial General Permit.

155.   The 2019 Decco Facility SWPPP lists the primary Standard Industrial Classifications ("SIC") code for the Facility as 3365 "Aluminum Foundries."

156.   The Owners and/or Operators of the Decco Facility describe the Facility as conducting "all activities required to produce aluminum casting for clients." 2019 Decco SWPPP § 2.1.2.

157.   The 2019 Decco SWPPP identifies numerous industrial materials that are stored, handled, or processed at the facility, including aluminum, sand, O&G, iron, copper, zinc, aluminum, and TSS. *Id.* Table 2.1; Table 3.5. The SWPPP further states "[t]hese activities and associated materials will or could potentially contribute pollutants to stormwater runoff." *Id.* § 2.3.1.

158.   The SWPPP further acknowledges the following pollutant source at the Facility: "an area at the northeast side of the site is where sand casting is recycled and can contribute to sediment." *Id.* § 3.1.5.

159.   Plaintiffs are informed, believe, and thereon allege that pollutants associated with the Facility's industrial activities have been and continue to be tracked throughout the entire site.

160.   Plaintiffs are informed, believe, and thereon allege that many of the industrial activities conducted at the Facility occur outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the facility.

/ / /

161. Plaintiffs are informed, believe, and thereon allege that many pollutants associated with the industrial activities occurring indoors or under partial shelter regularly escape via wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout the Facility.

162. Plaintiffs are informed, believe, and thereon allege that the pollutants associated with the Facility have been and continue to be tracked by vehicles and dispersed via wind throughout the entire site, and on and off the Facility through ingress and egress. This results in trucks and vehicles tracking sediment, dirt, O&G, metal particles, and other pollutants off-site.

163. Plaintiffs are informed, believe, and thereon allege that one or more of the regulated industrial activities is conducted at locations throughout the entire Facility, and thus the entire Facility requires Industrial General Permit coverage.

164. Plaintiffs are informed, believe, and thereon allege that even if regulated industrial activities are not conducted at all locations throughout the entire facility, no adequate BMPs or other controls exist to separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities.

165. Plaintiffs are informed, believe, and thereon allege that storm water from areas of the Facility where industrial activities are conducted commingles with storm water from other areas of the Facility, and thus all storm water discharges from the Facility are regulated under the Industrial General Permit.

166. Plaintiffs are informed, believe, and thereon allege that industrial activities at the Decco Facility generate significant amounts of numerous pollutants. During rain events, these pollutants are washed off surfaces throughout the facility and into storm water discharge points, which flow to Receiving Waters.

167. Plaintiffs are informed, believe, and thereon allege that the Decco Facility Owner and/or Operator has discharged and continues to discharge polluted storm water and non-storm water from the Facility in violation of the Industrial General Permit.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    25

168.   Plaintiffs are informed, believe, and thereon allege that the Decco Facility's polluted discharges have caused and/or contributed, and continue to cause and/or contribute, to the impairment of water quality in Receiving Waters in violation of the Industrial General Permit.

169.   Plaintiffs are informed, believe, and thereon allege that elevated levels of metals, sedimentation, and other pollutants have resulted in the inability of Receiving Waters to support their Beneficial Uses.

170.   Plaintiffs are informed, believe, and thereon allege that the illegal discharges of polluted storm water and non-storm water from the Decco Facility impact Coastkeeper and CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human health and aquatic life.

**B.     Facility Drainage Areas, Storm Water Flow, and Discharge Locations.**

171.   According to the 2019 Decco SWPPP, the Facility consists of one drainage area divided into three zones: the west zone, middle zone, and east zone. *Id*. § 2.1.3.

172.   The 2019 Decco SWPPP describes the northwest discharge point as SP-2 and the northeast discharge point as SP-1. *See id.* § 2.1.4. However, the 2019 Site Map labels the northwest discharge point as SP-1 and the northeast discharge point as SP-2.

173.   According to the 2019 Decco SWPPP, "[s]urface drainage at the site currently flows . . . towards two drainage outlets, one to a drop inlet and the other sheet flow off-site." *Id.* § 2.1.3. The drainage area discharging to SP-1, the sheet flow sampling point, contains storage of patterns, casting baskets, bone yard, and a core bake unit. The SWPPP states storm water in this drainage zone flows offsite via sheet flow. *Id.*

174.   According to the 2019 Decco SWPPP, discharge point SP-2 accepts water from the middle and east zones, containing the main production area, finishing area, molding floor, sand storage area, and flask storage. *Id.*

**C.     The Decco Facility Discharges Contaminated Storm Water in Violation of the Industrial General Permit.**

/ / /

175.   Plaintiffs are informed, believe, and thereon allege that with every significant rain event, the Decco Facility discharges polluted storm water via storm drainage systems into the Receiving Waters.

176.   Plaintiffs are informed, believe, and thereon allege that the Receiving Waters into which the Decco Facility Owner and/or Operator discharges polluted storm water are waters of the United States and therefore the Industrial General Permit properly regulates discharges to those waters.

177.   Plaintiffs are informed, believe, and thereon allege that storm water discharges from the Decco Facility violate the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations of the Industrial General Permit.

### 1. Discharges of Polluted Storm Water from the Decco Facility Violate Industrial General Permit Effluent Limitations.

178.   Plaintiffs are informed, believe, and thereon allege that the Facility has failed and continues to fail to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards to prevent the discharge of polluted storm water from the Facility. *See* 1997 Permit § B.3; 2015 Permit § V.A. For example, storm water samples collected by the Facility on February 7, 2017 reflected copper concentrations at 0.336mg/L, over twenty-eight times higher than the EPA Benchmark for copper of 0.013 mg/L. *See* Ex. A to Notice Letter; *see also* MSGP Fact Sheet at 55–56.

179.   The Decco Facility's own monitoring data further demonstrates that the Facility has discharged numerous additional pollutants, including TSS, aluminum, iron, and zinc in excess of EPA Benchmarks. Ex. A to Notice Letter.

180.   Plaintiffs thereon allege that the Facility has discharged, and continues to discharge TSS, aluminum, copper, iron, and zinc in excess of EPA Benchmarks.

181.   Plaintiffs are informed, believe, and thereon allege that the Decco Facility's exceedances of EPA Benchmarks indicate the Facility has failed and continues to fail to develop and/or implement BMPs that meet BAT/BCT in violation of the Industrial

General Permit.

182.   Each time the Facility Owner and/or Operator discharges polluted storm water in violation of Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

183.   Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation of these Effluent Limitations since October 23, 2013, and Coastkeeper and CERF will update the dates of violations when additional information and data become available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since October 23, 2018.

### 2.   Discharges of Polluted Storm Water from the Decco Facility Violate Industrial General Permit Receiving Water Limitations.

184.   Plaintiffs are informed, believe, and thereon allege that the Decco Facility has violated and continues to violate Industrial General Permit Receiving Water Limitations during every significant rain event. For example, the Facility's own storm water monitoring data shows instances of high TSS concentrations.

185.   The San Diego Basin Plan sets forth a narrative standard for TSS mandating that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses."

186.   According to the 2016 303(d) List of Impaired Water Bodies, Forester Creek and the San Diego River are impaired for benthic community effects and are thus unable to support their designated Beneficial Uses.

187.   The Basin Plan explains that "[s]uspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen

out light, hindering photosynthesis and normal aquatic plant growth and development."
Basin Plan at 3-31.

188.   Plaintiffs are informed, believe, and thereon allege that the Facility's storm water discharges containing elevated concentrations of TSS in excess of the Basin Plan Water Quality Objective cause and/or contribute to the benthic community effects impairments of Forester Creek and the San Diego River.

189.   Plaintiffs are informed, believe, and thereon allege the Facility discharges elevated concentrations of several toxic metals in excess of CTR standards. For example, storm water monitoring data for samples collected from the Facility on February 27, 2018 showed concentrations of copper at 0.075 mg/L and zinc at 1.3 mg/L present at the Facility.

190.   The CTR standard for copper is 0.013 mg/L.

191.   The CTR standard for zinc is 0.12 mg/L.

192.   According to the 2016 303(d) List of Impaired Water Bodies, the San Diego River is impaired for toxicity and is thus unable to support its designated Beneficial Uses.

193.   Zinc and copper are considered toxic pollutants, and limitations on zinc and copper are specifically enumerated in the California Toxics Rules. 40 C.F.R. § 131.38.

194.   Plaintiffs are informed, believe, and thereon allege the Facility has discharged, and continues to discharge, copper and zinc in excess of CTR standards, and that such discharges cause and/or contribute to the toxicity impairment of Receiving Waters.

195.   Because the CTR and Basin Plan are applicable WQSs under the Industrial General Permit, Plaintiffs are informed, believe, and thereon allege that discharges from the Decco Facility contain concentrations of pollutants that cause or contribute to violations of multiple applicable WQSs, and thus violate Receiving Water Limitation C.2 of the 1997 Permit and/or Receiving Water Limitation VI.A of the 2015 Permit. *See Kramer Metals*, 619 F. Supp. 2d at 927 ("A permittee violates Receiving Water Limitation C(2) when it 'causes or contributes to an exceedance of' [a water quality

standard], including the CTR").

196.   Plaintiffs are informed, believe, and thereon allege that discharges of elevated concentrations of pollutants in the Decco Facility's storm water discharges also adversely impact human health, thus violating the Permit Receiving Water Limitation C.1 of the 1997 Permit, and VI.B of the 2015 Permit.

197.   Each time the Decco Facility Owner and/or Operator discharges polluted storm water in violation of the Industrial General Permit's Receiving Water Limitations is a separate and distinct violation of the Industrial General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

198.   Plaintiffs are informed, believe, and thereon allege that the Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the Industrial General Permit's Receiving Water Limitations.

199.   Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation since October 23, 2018, and Plaintiffs will update the dates of violation when additional information and data becomes available. Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since October 23, 2018.

**D.    The Decco Facility Owner and/or Operator Has Violated and Continues to Violate Industrial General Permit SWPPP Requirements.**

200.   The original Decco Facility SWPPP, dated July 27, 2015 ("2015 Decco SWPPP"), was uploaded to the SMARTS database by the Decco Facility Owner and/or Operator.

201.   Plaintiffs are informed, believe, and thereon allege the Decco Facility Owner and/or Operator has revised the Facility SWPPP several times since the 2015 Decco SWPPP, in November 2016, July 2018, and January 2019.

202.   Plaintiffs are informed, believe, and thereon allege that the Facility Owner and/or Operator has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

203.   Plaintiffs are informed, believe, and thereon allege that the Facility SWPPP

and site map have failed to accurately identify, label, and describe all industrial activities and pollutant control measures at the Facility in violation of the Storm Water Permit. *See, e.g.*, 2015 Permit, §§ X.E.3.c, X.G.

204.   Plaintiffs are informed, believe, and thereon allege the Decco Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a SWPPP that includes an adequate pollutant source assessment in violation of the Industrial General Permit.

205.   Plaintiffs are informed, believe, and thereon allege that the 2019 Decco SWPPP has failed and continues to fail to adequately and/or accurately identify, describe, and assess all potential pollutants Facility's potential contribution of pollutants for which the Receiving Waters are impaired. For example, the Facility's SWPPPs fail to acknowledge the Lower San Diego River's impairment for toxicity. *See* 2019 Decco SWPPP § 2.1.1.

206.   Storm water monitoring data for samples collected from the Facility on February 27, 2018 evidences high concentrations of aluminum, copper, iron, and zinc, all of which exceeded various Effluent Limitations, Water Quality Objectives, and Receiving Water Limitations.

207.   Given the activities, operations, and materials present at this Facility, Plaintiffs are informed, believe, and thereon allege that the 2019 Decco Facility SWPPP fails to adequately and accurately assess the vast majority of the pollutants present at the Facility in violation of the Storm Water Permit's SWPPP requirements.

208.   Plaintiffs are informed, believe, and thereon allege that, due in part to the Decco Facility SWPPP's failure to adequately assess all pollutants and pollutant sources at the Facility, storm water discharged from the Facility contains numerous pollutants in exceedance of EPA Benchmarks values, CTR limits, and/or Basin Plan objectives in violation of the Industrial General Permit.

209.   Plaintiffs are informed, believe, and thereon allege that, despite the significant concentrations of pollutants in the Facility's storm water discharges each and

every year, the Facility's SWPPP has not been revised to include BMPs that adequately eliminate or reduce these pollutants, as required by the Industrial General Permit.

210. Plaintiffs are informed, believe, and thereon allege that the Decco Facility SWPPPs fail to adequately assess the BMPs with respect to the Facility's potential pollutant sources.

211. Plaintiffs are informed, believe, and thereon allege that the Decco Facility's numerous and repeated discharges of several pollutants in exceedance of Effluent Limitations and Receiving Water Limitations demonstrates that the Facility Owner and/or Operator has failed to develop and/or implement BMPs that:

    i. adequately minimize the exposure of pollutants to storm water at the Facilities;

    ii. adequately control and minimize polluted runoff from the Facilities;

    iii. adequately treat and remove pollutants in storm water prior to the discharge;

    iv. adequately prevent or control contaminated storm water from being discharged from the Facilities; and

    v. adequately prevent or control contaminated NSWDs from being discharged from the Facilities.

212. Plaintiffs are informed, believe, and thereon allege that the Decco Facility SWPPPs fail to adequately analyze the effectiveness of the Facility's existing BMPs.

213. Plaintiffs are informed, believe, and thereon allege that the inadequacy of the BMPs at the Decco Facility is in part a result of the Facility Owner and/or Operator's failure to develop, implement, and revise adequate SWPPPs.

214. Plaintiffs are informed, believe, and thereon allege that the Decco Facility Owner and/or Operator's failure to adequately revise the Facility's SWPPP, and thus failure to improve the Facility's BMPs, despite the numerous and repeated exceedances of Effluent Limitations, Receiving Water Limitations, and NALs identified in Defendant's own monitoring data, ensures that these exceedances will continue in

1    violation of the Industrial General Permit.

2       215.   Every day the Facility Owner and/or Operator operates the Facility with an

3    inadequately developed and/or implemented SWPPP, and/or without properly revising

4    the SWPPP, is a separate and distinct violation of the Industrial General Permit, New

5    Industrial Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

6       216.   Plaintiffs are informed, believe, and thereon allege that the Decco Facility

7    Owner and/or Operator has been in daily and continuous violation of the Industrial

8    General Permit SWPPP requirements since at least X DATE FIVE YEARS FROM

9    FILING. These violations are ongoing, and Plaintiffs will include additional violations

10   when information becomes available.

11   **E.    Defendant Has Failed to Develop, Implement, and/or Revise Adequate**

12   **Monitoring and Reporting Programs at the Decco Facility.**

13      217.   Plaintiffs are informed, believe, and thereon allege that the Decco Facility

14   Owner and/or Operator has conducted and continues to conduct operations at the Facility

15   with an inadequately developed, implemented, and/or revised M&RP.

16      218.   Plaintiffs are informed, believe, and thereon allege that the Decco Facility

17   Owner and/or Operator has failed and continues to fail to develop and/or implement a

18   M&RP that requires the collection of storm water samples from all discharge locations at

19   the Facility in violation of Section XI.B.4 of the 2015 Permit. For example, the Facility

20   Owner and/or Operator failed to sample from SP-2 on January 5, 2017. Furthermore,

21   multiple other monitoring reports from 2016 and 2017 indicate the Facility Owners

22   and/or Operators collected samples from one discharge point in violation of the Industrial

23   General Permit.

24      219.   Plaintiffs are informed, believe, and thereon allege that the Decco Facility

25   Owner and/or Operator failed to collect samples for the requisite number of QSEs. For

26   example, while the Industrial General Permit requires Permittees to collect four samples

27   each reporting period, the Facility failed to collect four samples during the 2017–2018

28   reporting period, despite the occurrence of numerous QSEs during that reporting period.

*See* Ex. B to Notice Letter.

220.    Plaintiffs are informed, believe, and thereon allege that the Decco Facility Owner and/or Operator has failed to consistently and/or adequately conduct visual discharge observations and monitoring of BMPs as required by the Permit's M&RP requirements.

221.    Plaintiffs are informed, believe, and thereon allege that the Decco Facility M&RP has failed and/or continues to fail to ensure BMPs have been adequately developed and/or implemented, or revised if necessary. *See* 1997 Permit, §§ B.2.a–b; 2015 Permit §§ X.I, XI.

222.    Plaintiffs are informed, believe, and thereon allege the Decco Facility M&RP has failed and/or continues to fail to ensure storm water and non-storm water discharges are in compliance with the Industrial General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations in violation of the Industrial General Permit. *See* 1997 Permit § B.2; 2015 Permit §§ I.J.55–56, XI.

223.    Plaintiffs are informed, believe, and thereon allege that the Decco Facility Owner and/or Operator has failed to revise the M&RP as necessary to ensure compliance with the Industrial General Permit. *See* 1997 Permit § B.2.d; 2015 Permit § XI.A.4.

224.    Because the Decco Facility Owner and/or Operator has failed to revise the M&RP as required by the Industrial General Permit, the M&RP fails to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility in violation of the Permit. *See* 1997 Permit § B.4.c; 2015 Permit § X.B.1.

**F.    Defendant Has Failed to Comply with Level 1 and Level 2 ERA Requirements.**

225.    The Decco Facility entered Level 1 status for O&G, copper, and zinc following the 2015–16 reporting period.

226.    Following the 2016–17 reporting period, the Facility entered Level 2 status for zinc and copper, and entered Level 1 status for iron and aluminum.

/ / /

227.   Following the 2017–18 reporting period, the Facility remained in Level 1 status for iron and aluminum and Level 2 for zinc and copper.

228.   Plaintiffs are informed, believe, and thereon allege that, due to the Facility's failure to collect samples from all drainage areas and all discharge points, the Facility's monitoring data fails to accurately portray the Decco Facility's actual NAL exceedances and proper ERA levels.

229.   In December 2016, the Facility Owner and/or Operator submitted an ERA Level 1 Evaluation and Report for O&G, zinc, and copper ("2016 Level 1 ERA Report").

230.   Plaintiffs are informed, believe, and thereon allege that the 2016 Level 1 ERA Report failed to conduct an adequate Level 1 status evaluation to identify additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances at the Facility.

231.   Plaintiffs are informed, believe, and thereon allege that, because the Facility has continued to discharge zinc and copper in excess of NALs, the 2016 Level 1 ERA Report failed to adequately evaluate sources of zinc and copper, or recommend BMPs that would successfully reduce zinc and copper below the NAL standard. *See* 2015 Permit § XII.C.1.c.

232.   In December 2017, the Facility Owner and/or Operator submitted a consolidated ERA Level 1 Evaluation and Report for iron and aluminum ("2017 Level 1 ERA Report").

233.   Plaintiffs are informed, believe, and thereon allege that the 2017 Level 1 ERA Report failed to conduct an adequate Level 1 status evaluation to identify additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances at the Facility.

234.   In December 2017, the Decco Facility Owner and/or Operator published a Level 2 ERA Action Plan for zinc and copper, which is publicly available on the SMARTS online database.

/ / /

235.   The 2015 Permit requires that a Level 2 ERA Action Plan shall at a minimum address the drainage areas with corresponding Level 2 NAL exceedances. 2015 Permit § XII.D.1.c.

236.   As previously discussed, the Facility Owner and/or Operator has failed to collect samples from each drainage area and discharge point. For example, the Facility Owner and/or Operator only collects storm water from SP-1 in violation of the Industrial General Permit. As such, Plaintiffs are informed, believe, and thereon allege that the 2017 ERA Level 2 Action Plan failed to adequately evaluate the proper drainage areas, undermining the accuracy of the ERA action plan, as well as the effectiveness of the NAL iterative process.

## I.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the Industrial General Permit's Effluent Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

237.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

238.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator failed and continues to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at the Facility.

239.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from the Facility.

240.   The Facility Owner and/or Operator's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Industrial General Permit and the CWA. *See* 1997 Permit § B.3; 2015 Permit § I.D.32, V.A; *see also* 33 U.S.C. § 1311(b).

241.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator violated and continues to violate the Industrial General Permit Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharge from the Facility.

242.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has been in violation of the Industrial General Permit Effluent Limitation at the Facility every day from October 23, 2018, to the present.

243.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator's violations of the Industrial General Permit Effluent Limitation and the Clean Water Act are ongoing and continuous.

244.   The Facility Owner and/or Operator will continue to be in violation of the Industrial General Permit and the CWA each and every day they fail to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facility.

245.   Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the Industrial General Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

246.   Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations Guidelines in violation of the Industrial General Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

247.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 23, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

248.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or

1    adequate remedy at law.

2        249.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

3    an actual controversy exists as to the rights and other legal relations of the parties.

4                            **SECOND CAUSE OF ACTION**

5    **Discharges of Contaminated Storm Water in Violation of Industrial General
     Permit Receiving Water Limitations and the Clean Water Act.**

6                  **33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

7        250.   Plaintiffs incorporate the allegations contained in the above paragraphs as

8    though fully set forth herein.

9        251.   Plaintiffs are informed and believe, and thereon allege, that the Facility

10   discharges storm water containing levels of pollutants that adversely impact human

11   health and/or the environment.

12       252.   Plaintiffs are informed and believe, and thereon allege, that the Facility

13   Owner and/or Operator discharges storm water containing levels of pollutants that cause

14   or contribute to exceedances of WQSs from the Facility.

15       253.   Plaintiffs are informed and believe, and thereon allege, that discharges of

16   storm water containing levels of pollutants that adversely impact human health and/or the

17   environment occur each time storm water discharges from the Facility.

18       254.   Plaintiffs are informed and believe, and thereon allege, that discharges of

19   storm water containing levels of pollutants that cause or contribute to exceedances of

20   WQSs occur each time storm water discharges from the Facility.

21       255.   The Facility Owner and/or Operator's discharges of storm water containing

22   levels of pollutants that adversely impact human health and/or the environment, and/or

23   that cause or contribute to exceedances of WQSs, are violations of the Industrial General

24   Permit and the Clean Water Act. *See* 1997 Permit §§ C.1–2; 2015 Permit §§ VI.A–B; *see

25   also* 33 U.S.C. § 1311(b).

26       256.   Plaintiffs are informed and believe, and thereon allege, that the Facility

27   Owner and/or Operator violated and will continue to violate the Industrial General Permit

28

Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, discharge from the Facility.

257.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has been in violation of the Industrial General Permit Receiving Water Limitations every day from October 23, 2018, to the present.

258.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator's violations of the Industrial General Permit Receiving Water Limitations and the CWA are ongoing and continuous.

259.   The Facility Owner and/or Operator will continue to be in violation of the Industrial General Permit and the CWA each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs is discharged from the Facility.

260.   Each day that Defendant has discharged and/or continues to discharge polluted storm water from the Facility in violation of the Industrial General Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

261.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 23, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

262.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

263.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

/ / /

/ / /

**THIRD CAUSE OF ACTION**

**Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the Industrial General Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

264.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

265.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has failed and continues to fail to develop and/or implement adequate SWPPPs for the Facility.

266.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has failed and continues to fail to adequately revise the SWPPPs for the Facility.

267.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator conducts operations at the Facility each day without an adequately developed, implemented, and/or revised SWPPP.

268.   The Facility Owner and/or Operator's failure to adequately develop, implement, and/or revise SWPPPs for the Facility is a violation of the Industrial General Permit and the Clean Water Act. *See* 1997 Permit § A; 2015 Permit § X; *see also* 33 U.S.C. § 1311(b).

269.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has been in violation of the Industrial General Permit SWPPP requirements at the Facility every day from October 23, 2018, to the present.

270.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator's violations of the Industrial General Permit SWPPP requirements and the CWA at the Facility are ongoing and continuous.

271.   The Facility Owner and/or Operator will continue to be in violation of the Industrial General Permit and the CWA each and every day they fail to adequately develop, implement, and/or revise the SWPPPs for the Facility.

272.   Each day that Defendant operates the Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. § 1311(a).

273.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 23, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

274.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

275.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## FOURTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and Revise Adequate Monitoring and Reporting Plans in Violation of the Industrial General Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

276.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

277.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has failed and continues to fail to develop and/or implement an adequate M&RP for the Facility.

278.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has failed and continues to fail to adequately revise the M&RP for the Facility.

279.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator conducts operations at the Facility each day without an

adequately developed, implemented, and/or revised M&RP.

280.   The Defendant's failure to adequately develop, implement, and/or revise the M&RP for the Facility is a violation of the Industrial General Permit and the Clean Water Act. *See* 1997 Permit § B; 2015 Permit § XI; *see also* 33 U.S.C. § 1311(b).

281.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has been in violation of the Industrial General Permit M&RP requirements every day from October 23, 2018, to the present.

282.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator's violations of the Industrial General Permit M&RP requirements and the CWA at the Facility are ongoing and continuous.

283.   The Facility Owner and/or Operator will continue to be in violation of the Industrial General Permit and the CWA each and every day they fail to adequately develop, implement, and/or revise the M&RP for the Facility.

284.   Each day that Defendant operates the Facility without developing, implementing, and/or revising an adequate M&RP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

285.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 23, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

286.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

287.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

/ / /

/ / /

**FIFTH CAUSE OF ACTION**

**Failure to Properly Monitor in Violation of the Industrial General Permit.**

288.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

289.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has failed and continues to fail to conduct the requisite visual observations of storm water discharges at the Facility.

290.   The Facility Owner and/or Operator's failure to conduct the requisite visual observations at the Facility is a violation of the Industrial General Permit and the CWA. *See* 1997 Permit §§ B.3–4; 2015 Permit § XI.A; *see also* 33 U.S.C. § 1311(b).

291.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has failed to collect and analyze the required number of storm water samples the Facility.

292.   The Facility Owner and/or Operator's failure to collect and analyze the required number of storm water samples at the Facility is a violation of the Industrial General Permit and the CWA. *See* 1997 Permit §§ B.5.a–b, 2015 Permit §§ XI.B.1–3; *see also* 33 U.S.C. § 1311(b).

293.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has failed and continues to fail to comply with the Industrial General Permit's monitoring requirements at the Facility since October 23, 2018.

294.   Plaintiffs are informed and believe, and thereon allege, that the several of the Facility Owner and/or Operator's violations of the Industrial General Permit monitoring requirements and the Clean Water Act are ongoing and continuous.

295.   The Facility Owner and/or Operator will continue to be in violation of the Industrial General Permit and the CWA each and every day they fail to comply with the Industrial General Permit's monitoring requirements.

296.   Each and every violation of the Industrial General Permit's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C.

§ 1311(a).

297.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 23, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

298.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

299.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SIXTH CAUSE OF ACTION

**Failure to Comply with ERA Requirements in Violation of the Industrial General Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

300.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

301.   Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator has failed and continues to fail to conduct an adequate Level 1 status evaluation for the Decco Facility.

302.   Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator has failed and continues to fail to submit an adequate Level 1 ERA Report for each of the Decco Facility.

303.   Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator conducts operations at the Decco Facility each day without conducting an adequate Level 1 Evaluation and/or without submitting an adequate Level 1 ERA Report.

304.   Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator's failure to conduct an adequate Level 1 Evaluation and/or failure to file an adequate Level 1 ERA Report is a violation of the Industrial General Permit. 2015 Permit § XII(C).

305.   Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator has been in daily and continuous violation of the Industrial General Permit Level 1 status Evaluation requirements every day since at least October 1, 2016.

306.   Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator have been in daily and continuous violation of the Industrial General Permit Level 1 status ERA reporting requirements every day since at least January 1, 2017.

307.   Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator's failure to submit adequate Level 2 Action Plans is a violation of the Industrial General Permit.

308.   Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator's failure to submit adequate Level 2 Technical Reports is a violation of the Industrial General Permit.

309.   The Facility Owner and/or Operator will continue to be in violation of the Industrial General Permit and the CWA each and every day the Facility Owner and/or Operator fails to comply with the Level 1 and Level 2 ERA requirements at the Decco Facility.

310.   Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator's violations of the Level 1 and Level 2 ERA requirements of the Industrial General Permit and the CWA are ongoing and continuous.

311.   Every day the Facility Owner and/or Operator conducts operations at the Decco Facility without conducting an adequate Level 1 status evaluation, and/or without submitting adequate Level 1 ERA Report, Level 2 Action Plans, and/or Level 2

Technical Reports is a separate and distinct violation of the Industrial General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

312.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the Level 1 status Evaluation requirements occurring from October 1, 2016, to the present, and for each and every violation of the Level 1 ERA Report requirements occurring from January 1, 2017, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

313.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

314.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendant as set forth hereafter.

**J.      RELIEF REQUESTED**

315.   Plaintiffs respectfully request that this Court grant the following relief:

a.      A court order declaring the Defendant to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include BAT/BCT requirements, for failing to meet receiving water limitations, and for failing to comply with the substantive and procedural requirements of the Industrial General Permit;

b.      A court order enjoining Defendant from discharging pollutants without a NPDES permit;

c.      A court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural

requirements of the Industrial General Permit and the Clean Water Act;

      d.    A court order assessing civil monetary penalties for each violation of the CWA at $37,500.00 per day per violation for all CWA violations after January 12, 2009, and $55,800.00 per day per violation for violations that occurred after November 2, 2015, as permitted by CWA Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

      e.    A court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

      f.    Any other relief as this Court may deem appropriate.

Dated: March 20, 2020

Respectfully submitted,

COAST LAW GROUP LLP

By: s/Livia B. Beaudin
LIVIA B. BEAUDIN
Attorney for Plaintiffs
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION
E-mail: livia@coastlawgroup.com

SAN DIEGO COASTKEEPER

By: s/Matt O'Malley
MATT O'MALLEY
Attorney for Plaintiffs
SAN DIEGO COASTKEEPER
E-mail: matt@sdcoastkeeper.org